IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

RYAN SCOTT HARRIS,

Defendant.

CRIMINAL ACTION FILE
NO. 4:11-CR-18-HLM-WEJ

## NON-FINAL REPORT AND RECOMMENDATION

This matter is before the Court on defendant Ryan Scott Harris's Motion to
Suppress Statements [13]. On August 11, 2011, the Court conducted an evidentiary
hearing [16] regarding the instant Motion, which has been transcribed [18]. The
parties have briefed the matter. (See Br. Supp. Mot. Suppress Statements [20]
("Def.'s Br."); Gov't Resp. [21].) On the basis of the testimony and evidence
produced at that hearing, the undersigned **REPORTS** that police took Mr. Harris
into custody but failed to provide him with a Miranda warning prior to a brief
interrogation that yielded an incriminating statement. Police then transported Mr.
Harris to the station, Mirandized him, and obtained a knowing and voluntary waiver
and voluntary confession from him at that time. Therefore, the undersigned
**RECOMMENDS** that defendant's Motion to Suppress Statements [13] be

**GRANTED** as to his pre-Miranda statement and **DENIED** as to his post-Miranda statement.

## I.   STATEMENT OF FACTS

### A.   Traffic Stop and Initial Questioning

On the morning of January 27, 2011, Jake Sutton, then employed as a police officer by the City of Adairsville Police Department, was on patrol in a marked police cruiser and within the city limits when he observed a white Ford F-250 pick-up truck turn onto Pleasant Valley Road.  (Tr. 6-8; <u>see also</u> <u>id.</u> at 46, 56.)  Officer Sutton also turned onto that road and, as his cruiser approached the rear of the truck, its driver sped up and made a hard, erratic left turn without a signal and improperly passed another vehicle.  (<u>Id.</u> at 8-9.)   Officer Sutton turned on the cruiser's blue lights to conduct a traffic stop.  (<u>Id.</u>)  Initially, the truck increased its speed, but then stopped after traveling about one mile down a residential street.  (<u>Id.</u> at 9.)

Officer Sutton approached the truck, explained to the driver why he had initiated the traffic stop, asked for identification from the driver (Natasha Lee) and her sole passenger–Mr. Harris–and for the vehicle's registration.  (Tr. 10-11, 32.)  Ms. Lee provided Officer Sutton with a driver's license but could not produce proof of registration for the truck; Mr. Harris told Officer Sutton his name.  (<u>Id.</u> at 11.)

2

Officer Sutton noted that Ms. Lee and defendant appeared nervous and that defendant was sweating despite the cold temperature (28°F). (Id. at 30, 41; see also id. at 47, 52.) Officer Sutton returned to his cruiser to verify the information; police dispatch informed him that the truck had been reported stolen and that Mr. Harris's driver's license had been suspended due to prior drug charges. (Id. at 11, 13-14; see also id. at 46, 56.) At that point, the stop had lasted about five minutes, and Officers Michael Gallman and Jonathan Caves,[1] also with the Adairsville Police Department, arrived at the scene to assist Officer Sutton. (Id. at 11-12, 15, 44-47, 53, 55-56.)

Officers Sutton and Gallman approached the vehicle, asked Ms. Lee and Mr. Harris to exit the truck, advised them that it had been reported stolen, handcuffed them behind the back, and patted them down for weapons. (Tr. 12, 16, 47, 56-58.) Officer Sutton noted that defendant did not seem unsteady when he exited the truck. (Id. at 41.) Officer Sutton placed Ms. Lee in the back of his patrol car and Officers Caves and Gallman escorted defendant to the back of their patrol car. (Id. at 12, 16, 47, 58.) Officer Caves noted that Mr. Harris appeared nervous and was sweating but was unsure if he was under the influence of narcotics. (Id. at 47, 52.) Mr. Harris

---

[1] Officer Caves was in training at the time as he had been hired in November 2010. (Tr. 45-47, 52.) Officer Gallman was the most senior officer of the three patrolmen. (Id. at 61.)

3

followed Officers Caves's and Gallman's instructions, did not fall in and out of consciousness, and did not get ill or complain of feeling so; however, Mr. Harris did state that he was hot, and Officer Caves adjusted the temperature of his patrol car to accommodate him.  (Id. at 47-48, 58; see also id. at 50, 52-53, 62.)

Officer Sutton confirmed that the truck matched the description of the vehicle reported as stolen, which included identifying marks (stickers, front bumper tag, and possibly a dent or a cracked windshield).  (Tr. 14.)  At some point during the traffic stop, Officer Sutton asked Mr. Harris the following questions while he was handcuffed and seated in the back of a patrol car: "Whose truck is this?," "What is this?," and "Anything in the truck I need to know about?"  (Id. at 32-33.)[2]  In response, Mr. Harris stated "Anything that's in the truck's mine, it's not Natasha's."  (Id. at 32-33; see also id. at 35.)  Officer Sutton asked Ms. Lee similar questions and she denied knowing what was in the truck.  (Id. at 34-35.)  During the above events, Officer Sutton did not threaten Mr. Harris, make him any promises, or point a firearm at him and did not observe anyone engage in such behavior toward Mr. Harris.  (Id. at 26.)

_____

[2] It is unclear whether Officer Sutton questioned defendant before or after the officers conducted an impound search of the truck.  (Tr. 33.)

Because the truck was to be towed and impounded, the officers conducted an inventory search pursuant to Adairsville Police Department policy. (Tr. 12-14, 16, 29-30, 54-55, 59.)  Officer Sutton  found a black box containing digital scales, tweezers, and suspected methamphetamine. (Id. at 12-16, 29-31.) Officers Gallman and Caves found drug paraphernalia, marijuana seeds, marijuana, a grinder, an Airsoft gun, and a knife. (Id. at 12, 15-16, 49.) Officer Sutton then seized the above evidence, placed it in the front seat of his patrol car, and transported Ms. Lee to the Adairsville Police Department.  (Id. at 16.)  At that point, approximately thirty minutes had elapsed from the initiation of the stop until Officer Sutton left the scene with Ms. Lee.  (Id. at 16-17.)

Officers Gallman and Caves waited ten to fifteen minutes for the tow truck to arrive and then drove defendant to the police station.  (Tr. 16, 49, 59.)  During that time, the officers did not threaten Mr. Harris or make him any promises.  (Id. at 49-50, 58; see also id. at 60-61.)  According to Officer Gallman, a maximum of thirty-five minutes elapsed between the time he and Officer Caves arrived at the scene and the time they delivered Mr. Harris to the police station.  (Id. at 60.) Officer Gallman observed defendant during that time and noted that he was nervous and sweating;

5

however, Officer Gallman did not believe defendant to be under the influence of drugs or alcohol.  (Id. at 60, 63.)

### B.   Post-Miranda Questioning

When Mr. Harris arrived at the police station, Officer Sutton administered the Miranda rights to him in the booking room; Officers Gallman[3] and Caves, and possibly Ms. Lee, were present.  (Tr.17-18, 32, 34, 36, 62.) According to Officer Sutton, Mr. Harris was very nervous, shaky, sweaty, jumpy, jittery, and scratched an apparent itch several times.  (Id. at 25, 31-32, 35, 41, 43.)  It appeared to Officer Sutton that Mr. Harris was under the influence of drugs.  (Id. at 25, 31, 41, 43.) However, Mr. Harris followed the officers' instructions, timely responded to their questions, and did not complain of feeling ill or state that he was under the influence of drugs.  (Id. at 25, 41; see also id. at 64.)  Mr. Harris did not ask to stop the interview, ask for medicine, ask for an attorney, or make any requests of the officers. (Id. at 25-26, 62.)

Officer Sutton provided defendant with a written statement of the Miranda rights, read them to him, and asked defendant if he understood those rights.  (Tr. 18-

---

[3] Although Officer Gallman was present while Officer Sutton administered the Miranda rights to defendant, he was not paying attention to that process.  (Tr. 62-63.)

20, 36.) Mr. Harris stated that he did, and it appeared to Officer Sutton that Mr.

Harris understood the rights. (Id. at 18-20, 36.) At 8:40 a.m., defendant signed a

"Waiver Certificate," stating that he had a twelfth-grade education, understood his

Miranda rights, waived them, and was willing to talk about the truck and the drugs

found therein; Officer Sutton also initialed the form. (Tr. at 18-21, 36; Gov't Ex. 1

(Waiver Certificate).) Although Officers Gallman and Caves also were present, only

Officer Sutton questioned Mr. Harris. (Tr. 21.) During the interview, defendant had

one arm handcuffed to a chair and the other free. (Id. at 22.) Mr. Harris appeared

to understand Officer Sutton's questions and to answer them willingly, stating that

the drugs were his but that the truck was not stolen. (Id. at 21-22, 36, 42.) The

interview lasted approximately two minutes. (Id. at 22.)

At 8:53 a.m, defendant made the following written statement in Officer

Sutton's presence:

> I got the truck Tue. I pad [sic] 1500 for the truck. I got the truck from
> Richy. I got the title for the truck. The drugs is mine not Tasha. The
> guns are not mine they where lift [sic] in the back of the truck. They
> are not mine [or] Tasha and I did not still [sic] the truck. God hope.

(Gov't Ex. 2 (Voluntary Statement); see also Tr. 22-25, 36.) On the Voluntary

Statement form, Mr. Harris initialed a paragraph warning him that he could be held

7

liable for any false information provided therein.  (Tr. 24.)  Defendant made the above written statement approximately fifteen minutes after arriving at the police station.  (Id. at 25.)  While at the police station, Officer Sutton did not threaten Mr. Harris, make him any promises, or point a firearm at him, and did not observe anyone engage in such behavior toward Mr. Harris.  (Id. at 27.)

C.    **Agent Mueller**

After defendant's arrest, a lieutenant with the Adairsville Police Department contacted Drug Enforcement Administration Special Agent ("SA") Christopher A. Mueller to request that Mr. Harris be prosecuted in federal court.  (Tr. 65-67.)  SA Mueller has been with the DEA since 1998.  (Id. at 66.)  Although SA Mueller did not observe or interact with Mr. Harris during or immediately after the arrest at issue, he provided a lay opinion at the August 11, 2011 hearing as to the various side-effects of methamphetamine.  (Id. at 66-73.)

SA Mueller testified that a person's reaction to a drug varies depending on his tolerance to it (built up by usage) and the length of time he has been using the drug, both during his lifetime and during a specific period.  (Tr. 67-68.)  According to SA Mueller, a person under the influence of methamphetamine will exhibit paranoia, often groom himself or be attentive to a specific item, and often will not be able to

8

react to outside stimuli as a normal person would.  (Id. at 68-70.)  SA Mueller

testified that a person who uses methamphetamine, but presently is not under the

influence, will exhibit the some of those behaviors.  (Id. at 68.)  However, such a

person will interact with others more easily than someone under the influence of

methamphetamine.  (Id. at 68-69.)  In SA Mueller's experience, someone who is able

to follow instructions and comply with directions is likely not under the influence

of drugs.  (Id. at 70.)

SA Mueller acknowledged that sweating in cold weather could indicate that

the person is under the influence of drugs.  (Tr. 72.)  Likewise, he admitted that a

person who groomed himself frequently, was sweaty, jittery, and constantly

scratching himself could possibly be under the influence of drugs.  (Id. at 73.)

## II.    **THE CHARGING DOCUMENT**

On May 2, 2011, the grand jury returned a single-count Indictment [1] with

a forfeiture provision against Mr. Harris, concerning conduct allegedly occurring in

this District.   The Indictment alleges that, on January 27, 2011, Mr. Harris

knowingly possessed, with intent to distribute, methamphetamine in violation of 18

U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii).  (Indictment 1.)

### III.   **CONTENTIONS OF THE PARTIES**

Mr. Harris argues that his first statement was the result of a custodial interrogation conducted without a Miranda warning; thus, the statement he made while held in the police cruiser must be suppressed.  (Def.'s Br. 20.)  Likewise, defendant argues that his first and second statements should be suppressed as involuntary because he was intoxicated at the time and his condition was obvious to Officer Sutton.  (Id. at 8) Mr. Harris contends that, even though he had been Mirandized prior to making his second statement, he could not knowingly and voluntarily have waived those rights under the totality of the circumstances–i.e., his prior statement and his intoxication.  (Id. at 9–11.)

The Government responds that Mr. Harris was not in custody during the first statement and was not subject to an interrogation; therefore, a Miranda warning was not required and the statement is admissible. (Gov't Resp. 8-13.)  With regard to the second statement, the Government argues that defendant was fully aware of his Miranda rights at the time and knowingly and voluntarily waived them without coercion.  (Id. at 14-21.)

AO 72A
(Rev.8/82)

## IV.  **ADMISSIBILITY OF INCRIMINATING STATEMENTS**

Before a defendant's confession or self-incriminating statements may be presented to a jury, a defendant has a constitutional right to a fair hearing and an independent and reliable determination of the voluntariness of those statements. Jackson v. Denno, 378 U.S. 368, 376-77 (1964).  Pursuant to 18 U.S.C. § 3501(a), "the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness." United States v. Davidson, 768 F.2d 1266, 1270 n.1 (11th Cir. 1985) (explaining that § 3501(a) codified Jackson v. Denno requirement for criminal prosecutions).

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court noted that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized."  384 U.S. at 478.  Therefore, the Court held that the procedural safeguard of warning the suspect of his constitutional rights must be instituted to protect the privilege.  Id. at 478-79.  These so-called Miranda warnings "are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989).  A two-part inquiry determines the

11

admissibility of a confession or self-incriminating statement.  First, courts must determine whether the Miranda waiver is valid.  A defendant has validly waive his Miranda rights only if the totality of the circumstances show both of the following: (1) an uncoerced choice and (2) an awareness "of both the nature of the right being abandoned and the consequences of the decision to abandon it."  Moran v. Burbine, 475 U.S. 412, 421 (1986).

Second, even where the Government has complied with the requirements of Miranda, the Court must consider whether the confession or self-incriminating statement was voluntary.  United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994) (per curiam); United States v. Sims, 719 F.2d 375, 378 (11th Cir. 1983) (per curiam).  To determine whether statements were voluntary, the Court must examine the "totality of the circumstances, including the details of the interrogation and the defendant's characteristics."  United States v. Bernal-Benitez, 594 F.3d 1303, 1319 (11th Cir. 2010). The goal of that inquiry is to determine whether police overreached, considering factors such as "the [accused's] lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use

12

of physical punishment such as the deprivation of food or sleep." Id. (internal quotations and citations omitted) (alteration in original).

## V.   ANALYSIS

The Court first determines whether Mr. Harris was subject to custodial interrogation at the traffic stop.  If he was, then a Miranda warning was required for his first statement to be admissible.  The Court then examines whether Mr. Harris made a knowing, intelligent, and voluntary waiver of his Miranda rights at the station before giving a statement.  Underlying both statements is the issue of whether Mr. Harris was intoxicated.

### A.   Defendant's Statement at the Traffic Stop

Miranda warnings are required where an individual is both in custody and subject to interrogation.  Miranda, 384 U.S. at 477-78.[4]  For Fifth Amendment purposes, the inquiry for "in custody" status is whether, "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that degree associated with a formal

---

[4] In New York v. Quarles, 467 U.S. 649 (1984), the Supreme Court recognized a narrow exception to the requirements of Miranda where there is an immediate safety threat to the officers or the public.  467 U.S. at 657-58.  However, the Government does not argue that the public safety exception applies here.

13

arrest to such extent that he would not feel free to leave." United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000) (per curiam) (internal citations and quotations omitted); see also California v. Beheler, 463 U.S. 1121, 1125 (1983).  Interrogation is defined as express questioning or the functional equivalent–"any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).

Here, Officer Sutton obtained Mr. Harris first statement via custodial interrogation.  Shortly after Officer Sutton initiated the traffic stop, the officers told defendant that the truck had been reported as stolen, asked him to exit the truck, handcuffed him behind the back, and placed him in the rear seat of a police cruiser separate from Ms. Lee.  Under those circumstances, Mr. Harris was in custody, as a reasonable person would have concluded that his freedom of movement was restrained to the degree associated with formal arrest. See United States v. Young, 377 F. App'x 965, 969 (11th Cir. 2010) (holding that defendant "handcuffed and secured in . . . police cruiser" was clearly in custody).  Moreover, after telling defendant that the truck has been reported stolen, Officer Sutton should have known that posing questions such as, "Whose truck is this?," "What is this?," and "Anything

14

in the truck I need to know about?" (Tr. 32-33), likely would elicit an incriminating response.

Because Mr. Harris had not been advised of his Miranda rights when Officer Sutton elicited his first statement via custodial interrogation, the undersigned **RECOMMENDS** that defendant's Motion to Suppress be **GRANTED** as to the statement he made at the scene of the traffic stop.

### B.   Defendant's Statement at the Police Station

Mr. Harris does not deny that Officer Sutton provided him with a Miranda warning prior to the custodial interrogation at the police station. However, defendant characterizes his second statement as involuntary and obtained by "coercion" because he had already made an unwarned admission to Officer Sutton at the traffic stop and was intoxicated during both interrogations.

In Oregon v. Elstad, 470 U.S. 298 (1985), the Supreme Court rejected the defendant's contention that a second, warned confession must be suppressed because officers failed to Mirandize him prior to obtaining his first confession. 470 U.S. at 302, 309. The Supreme Court explained that it would be an "unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's

ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." Id. at 309. Thus, "Elstad sets out the general rule that the existence of a pre-warning statement does not require suppression of a post-warning statement that was knowingly and voluntarily made." United States v. Street, 472 F.2d 1298, 1312 (11th Cir. 2006) (citing Elstad, 470 U.S. at 309). With that standard in mind, the Court turns to the first Miranda prong (uncoerced choice).

There is no evidence that the officers coerced defendant into making his first statement, signing the Waiver Certificate, or making his second statement. The hearing testimony reflects that none of the officers made any threats or promises to defendant, or brandished a weapon in his presence either at the traffic stop, during transport, or at the police station. (Tr. 26-27, 49, 50, 58, 60-61.) Before questioning at the police station, Officer Sutton orally provided a Miranda warning to Mr. Harris and presented him with a written statement of those rights before defendant waived them. (Id. at 17-21, 32, 34, 36, 62.) Moreover, there is no indication that Officer Sutton deliberately used a two-step interrogation strategy to circumvent Miranda. See Missouri v. Seibert, 542 U.S. 600, 622 (2004) (requiring suppression of a post-warning confession if a "two-step interrogation technique was used in a

16

calculated way to undermine the Miranda warning"). Officer Sutton's questioning of defendant at the traffic stop was brief and general. See United States v. Street, 472 F.3d 1298, 1314 (11th Cir. 2006) (agent's questioning was not an attempt to circumvent Miranda in part because he did not withhold the warning, solicit a full confession, then Mirandize defendant and lead him back through his confession). Whether defendant was intoxicated at the time is irrelevant to the issue of coercion. See United States v. Martin, 434 F.2d 275, 278-79 (5th Cir. 1970) (concluding that defendant's intoxicated state was relevant to whether he knowingly and voluntarily waived his Miranda rights).[5] Thus, Mr. Harris's choice to waive his Miranda rights before making a second statement was uncoerced and the first Miranda prong is satisfied.

With regard to the second prong of Miranda, the test of whether a person is too affected by alcohol, drugs, or pain to knowingly, intelligently, and voluntarily waive his Miranda rights is one of coherence and an understanding of what is happening. See Martin, 434 F.2d at 279 (holding confession properly admissible where evidence supported finding that, while defendant had been drinking and was affected by

_____

[5] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions handed down before the close of business on September 30, 1981. Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc).

AO 72A
(Rev.8/82)

alcohol to some degree, "his faculties were not so impaired that he did not understand what was going on nor was he incoherent"); see also United States v. Adamson, No. 04-672, 2008 WL 167299, at *7 (E.D. Pa. Jan. 16, 2008) (collecting circuit court cases focusing on defendant's coherence and comprehension, and finding that anxiety and pain medication did not impair the defendant's ability to make a valid Miranda waiver).

Here, despite Mr. Harris's alleged intoxication, the hearing testimony supports a finding that he was coherent and cognizant of the situation when he waived his Miranda rights and spoke with Officer Sutton.  Mr. Harris was able to interact with the officers, providing his name to Officer Sutton, following instructions to exit the truck, telling Officer Caves he was hot when placed into the patrol car, and responding timely and appropriately to Officer Sutton's instructions and questions both at the traffic stop and at the police station.  Although Mr. Harris was nervous, jittery, itchy, and sweaty, he was not unsteady and did not fall in and out of consciousness or complain of feeling unwell or being intoxicated.

After Officer Sutton administered the Miranda rights, Mr. Harris stated that he understood his rights and signed a Waiver Certificate stating that he was willing to talk about the truck and drugs.  (Tr. 18-21; Gov't Ex. 1.)  Defendant's express oral

and written statement waiving those rights is "strong proof of the validity of that waiver." <u>See</u> <u>North Carolina v. Butler</u>, 411 U.S. 369, 373 (1979). Moreover, Mr. Harris was able to focus on Officer Sutton's questions at the police station, and to produce a coherent, responsive hand-written statement immediately following that interview. (<u>See</u> Gov't Ex. 2.) Mr. Harris also initialed a statement indicating that he would be liable for any false information provided on the form.

The undersigned accepts Officer Sutton's testimony that defendant appeared to be under the influence of drugs and SA Mueller's testimony that narcotics have varying effects on people depending on their individual drug history. However, there is no probative evidence that Mr. Harris had insufficient mental capacity to understand his Miranda rights and the consequences of waiving them, or to voluntarily waive those rights. Without more, Mr. Harris's contention that he was intoxicated at the time does not invalidate his Miranda waiver or make his second statement involuntary. <u>See</u> <u>United States v. Taylor</u>, 508 F.2d 761, 763 (5th Cir. 1975) ("The mere fact that the defendant had taken drugs prior to giving the statement does not render it inadmissible. The evidence must show the defendant was so affected as to make his statement, after appropriate warnings, unreliable or involuntary."); <u>see also</u> <u>United States v. Gaddy</u>, 532 F.3d 783, 788 (8th Cir. 2008)

("Sleeplessness, alcohol use and drug use are relevant to our analysis, but [i]ntoxication and fatigue do not automatically render a confession involuntary.") (internal quotations and citation omitted).  Additionally, there is no evidence of police overreaching during the interrogation at the police station.  Defendant indicated that he had a twelfth-grade education, did not make any requests of the officers during the two-minute interview, and made his second statement less than an hour after Officer Sutton initiated the traffic stop

Therefore, considering the totality of the circumstances, Mr. Harris made an uncoerced, knowing, and voluntary waiver of his Miranda rights, followed by a voluntary statement to Officer Sutton.   Accordingly, the undersigned **RECOMMENDS DENYING** defendant's Motion to Suppress as to defendant's second statement made while at the police station.

## VI.   CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Statements [13] be **GRANTED** as to his pre-Miranda statement and **DENIED** as to his post-Miranda statement.

AO 72A
(Rev.8/82)

**SO RECOMMENDED**, this 21st day of October, 2011.


WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

21

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

RYAN SCOTT HARRIS,

Defendant.

CRIMINAL ACTION FILE
NO. 4:11-CR-18-HLM-WEJ

## ORDER FOR SERVICE OF
## NON-FINAL REPORT AND RECOMMENDATION

Let this Non-Final Report and Recommendation of the United States
Magistrate Judge, made in accordance with 28 U.S.C. § 636(b)(1)(B) and the Court's
Local Criminal Rule 58.1(A)(3)(a), be filed and a copy, together with a copy of this
Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if
any, to the Non-Final Report and Recommendation within fourteen days of the
receipt of this Order. Should objections be filed, they shall specify with particularity
the alleged error(s) made (including reference by page number to any transcripts if
applicable) and shall be served upon the opposing party. The party filing objections
will be responsible for obtaining and filing the transcript of any evidentiary hearing
for review by the District Court. If no objections are filed, the Non-Final Report and

Recommendation may be adopted as the opinion and order of the District Court, and any appellate review of factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curiam).

The Clerk is directed to submit the Non-Final Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED**, this 21st day of October, 2011.

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)